IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY QUENTIN KELLY, #352736
    Plaintiff,
v.          *    CIVIL ACTION NO. RDB-17-1433

CORRECTIONAL OFFICER MATTHEW
  G. BAKER
SERGEANT WILLIAM L. THOMAS
WARDEN FRANK B. BISHOP, JR.
STATE OF MARYLAND
    Defendants.

*****

## **MEMORANDUM OPINION**

On May 13, 2017, the Court received for filing inmate Anthony Kelly's verified self-represented 42 U.S.C. § 1983 civil rights action, which also invokes the Americans With Disabilities Act ("ADA"), of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*. The Complaint seeks damages, as well as declaratory and injunctive relief, from Maryland Department of Public Safety and Correctional Services ("DPSCS") personnel. Defendants have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 10), as well as a legal memorandum (ECF No. 10-1),[1] and verified exhibits. ECF No. 16-3 to ECF No. 16-15. Kelly has filed Oppositions and a Motion to Appoint Counsel. ECF Nos. 12, 13, & 15.

The matter is ready for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). Defendants' Motion, construed as a motion for summary judgment, IS GRANTED and Judgment is entered in favor of Defendants for reasons to follow.

---

[1]     All exhibits are referenced by their electronic filing number.

## I. Background

Kelly, who is currently confined at the North Branch Correctional Institution ("NBCI"), alleges that on May 13, 2017, he asked Defendant Correctional Officer Baker to place him on the haircut list when Baker came to Kelly's cell. Kelly claims that he was told by Baker that Sergeant Thomas and Warden Bishop had indicated that if "Kelly refuse[d] to go back into general population do not let him get a haircut today let him wait another 30 days for a haircut." Kelly alleges that Baker walked away from his cell, came back, and twice tried to "bribe" him by saying that he (Baker) would let Kelly have a haircut if Kelly went back into general population. Kelly states that Baker then indicated that Kelly did not have to go back into population, but that Thomas and Bishop had indicated that Kelly would only get a haircut if he dropped his law suits.[2] Kelly asserts that it is "cruel and unusual punishment" for him to wait another 30 days for a haircut and that Defendants acted with an "evil motive." ECF No. 1, p. 3. He claims that another inmate on segregation refused to go back to general population, but was not harassed. Kelly asserts that he asked Baker for Administrative Remedy Procedure (ARP) grievance forms and was informed there were no ARP forms available.[3] Kelly seeks declaratory and injunctive relief, asking that Defendants Baker and Thomas be removed from his housing unit (HU) #1 B-Tier and be ordered to cease their "threats." He additionally requests compensatory, nominal, and punitive damages. *Id.*, pp. 4-6 & 9.

In a document received for filing on March 12, 2018, construed as a Supplemental

---

[2] Kelly attaches a Notice of Infraction he received from Baker for violating Rules 400 & 401 on May 13, 2017. Kelly allegedly refused to obey a direct order to present his hands for cuffing to be moved from his disciplinary segregation cell to general population. ECF No. 1-1.

[3] In his Affidavit Kelly claims that since Baker became a tier officer in his housing unit he would open Kelly's food slot at lunch time and "walk by with[out] giving Kelly [his] milk and bananas." ECF No. 1-2, p. 1.

2

Complaint, Kelly complains that he has only had one haircut in the past six months. ECF No. 16. An Affidavit filed by Kelly on April 3, 2018, claims that he had not received a haircut in four months. ECF No. 17.

## II. Standard of Review

Defendants' Motion is styled as a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) or, in the Alternative, for Summary Judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not

3

consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167. Given the exhibits presented here (which were also presented to Kelly), the Court has ample information with which to address the pleading as filed for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to...the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

4

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). However, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.

Because Kelly is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, the Court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

Defendants raise multiple arguments for dismissal of parties or of the case. They argue, in part, that: (1) Kelly has failed to exhaust his administrative remedies, (2) Warden Bishop did not personally participate in the alleged wrongdoings and may not be found culpable under respondeat superior liability, (3) the State of Maryland is immune from liability under the Eleventh Amendment and Defendants Bishop, Thomas and Baler are likewise immune from liability for claims brought against them in their official capacity, (4) the denial of milk and bananas does not constitute a conditions of confinement claim, (5) Kelly has failed to satisfy the minimum requirements for a Due Process, Equal Protection, and ADA claim, (6) Defendants did not engage in any retaliatory acts as a result of Kelly's lawsuits against Warden Bishop or other

DPSCS personnel, and (7) they are entitled to qualified immunity.

Defendants maintain that on May 13, 2017, Baker approached Kelly's cell because Kelly was scheduled to come off disciplinary segregation and move to general population. Kelly refused to come to the cell door to allow his cuffs to be applied. Kelly replied "I'm not going nowhere." ECF No. 10-3, p. 1. He was ordered to come to the security slot to be handcuffed and again refused. *Id.* Defendants state that Kelly has no verified enemies at NBCI. ECF No. 10-4, Durst Decl.

Baker affirms that he never informed Kelly that he had to return to general population to get placed on the haircut list, never said Kelly did not have to return to general population if he dropped his lawsuits or denied Kelly meals, and has no recollection of refusing to provide Kelly an ARP form. ECF No. 10-5, Baker Decl. The record of Kelly's segregation assignment for June 2017, has a notation indicating that on June 10, 2017, he received a haircut and was provided showers on June 1, 3, 5, 8-9. 12, 15, 17, 19, 24, 26, & 27, 2017. ECF No. 10-6.

Thomas and Bishop affirm that at no time did they tell Baker to deny Kelly a spot on the haircut list until he returned to general population, nor did they instruct Baker to tell Kelly that he did not have to return to general population if he dropped his lawsuits. ECF No. 10-7, Thomas Decl. & ECF No. 10-8, Bishop Decl. Defendants state that Kelly was not impeded in any manner from continuing to file motions in his "extant lawsuits" following the alleged May 2017 incident. ECF No. 10-9 to ECF No. 10-11.

The ARP coordinator at NBCI, Correctional Officer Scott Beeman, affirms that he receives and directs the investigation of ARPs to the Warden's Office. ECF No. 10-12, Beeman Decl. Beeman states that ARP forms are available to any inmate in the HU #1 B-Tier and Kelly has never submitted an ARP on any subject related to the events of May 13, 2017. *Id.* Further, a

6

search at Division of Correction Headquarters produced no record of Kelly filing an ARP appeal to the Commissioner of Correction. ECF No. 10-13, Donnelly Decl. Finally, the Executive Director of the Inmate Grievance Office (IGO) declares that Kelly has not filed any grievances with the IGO raising the allegations set out in this case. ECF No. 10-14, Neverdon Decl.

Kelly asks that Defendants' dispositive motion be denied. He claims that on June 10, 2017, another inmate refused to go back to general population, but was permitted to have a haircut that same day. ECF No. 12. He claims he was denied another haircut on September 9, 2017. Kelly takes issue with the statements made in Defendants' dispositive filing and also, observes that Defendants' summary judgment motion "DOES NOT MENTION" anything about his being refused a haircut or that he, himself, refused a haircut. Kelly further accuses Defendant Baker of lying under oath. He asks that Baker be ordered to take a polygraph examination. ECF No. 12.

Kelly additionally claims that the Court was given false information. He seemingly contends that Defendants did not discuss why two other segregation inmates who refused to go back to general population, were not harassed.[4] ECF No. 13.

### IV. Analysis

Defendants raise several affirmative defenses, chief among them: entitlement to Eleventh Amendment immunity, non-exhaustion of available administrative remedies, his failure to state a claim, and qualified immunity. The affirmative defense of administrative exhaustion shall be addressed before the Court may examine the merits of Kelly's claims. The Prisoner Litigation Reform Act provides, in pertinent part:

---

[4] Kelly acknowledges that one of the inmates was, in fact, cited with an infraction. ECF No. 13, p. 1.

7

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

Defendants raise the affirmative defense that Kelly has failed to exhaust his administrative remedies. If Kelly's claim has not been properly presented through the administrative remedy procedure it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by

defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Nevertheless, a claim that has not been exhausted may not be considered by this Court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining"[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).[5]

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that

---

[5] The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). However, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 136 S.Ct. 1850 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, Kelly is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is

10

unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Kelly's original Complaint contended that when he requested the ARP forms, Baker told him they were unavailable. In his Declaration, Baker affirms he has no recollection of so informing Kelly and he "always gives inmates ARP forms if they ask for one when they are available in the area that I am in." The Court is aware that DPSCS inmates may have allegedly experienced difficulty obtaining ARP forms over a period of time. At no point, however, in his Complaint or Oppositions does Kelly allege that he further attempted to obtain the ARP forms from another officer or explain why he failed to make a further attempt to exhaust his remedies. Even assuming that Baker's comment to Kelly was true, there is no showing that the remedy process was totally unavailable to Kelly in that other NBCI personnel interfered with his attempt to file a remedy. Plainly, given the exhibits before the Court, Kelly made no substantial attempt to exhaust his administrative remedies at any level of review.

Alternatively, the Court shall examine whether summary judgment in favor of the Defendants would be appropriate because the pleadings, declarations, and exhibits on file demonstrate that they did not violate Kelly's constitutional rights.

11

The State of Maryland is not a "person" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64-65 & 70-71 (1989). Moreover, the State of Maryland is immune from liability under the Eleventh Amendment from a § 1983 suit in federal court without regard to the nature of the relief sought. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-01 (1984); *C.H. v. Oliva*, 226 F.3d 198, 201 (3rd Cir. 2000).

Further, in order for liability to exist under 42 U.S.C. § 1983, the defendant must be personally involved in the alleged violation. *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). Under *Shaw*, supervisory liability may attach under § 1983 if a plaintiff can establish three elements: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices", and (3) an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.* at 799 (citations omitted).

No allegation demonstrates the supervisory liability of Warden Bishop with regard to the allegations at issue here. *See Shaw*, 13 F.3d at 799. Indeed, there is no evidence that Bishop had actual knowledge or involvement in denying Kelly privileges or retaliated against him for filing lawsuits. The liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Bayard v. Malone*, 268 F.3d 228, 235 (4th Cir.

2001), citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). Given his unrefuted Declaration, Bishop does not appear to have been personally involved in the issues presented here, or to have had actual or constructive knowledge of the issues. Accordingly, Warden Bishop is entitled to summary judgment as a matter of law.

Next, although Kelly cites to the Americans With Disabilities Act, he provides no claims under that statute. He has failed to show that he has a qualifying disability under the ADA. To state a claim for violation of the ADA, Kelly must show that he (1) has a disability, (2) is otherwise qualified to participate in a program, and (3) was denied the benefits of the program or discriminated against because of the disability. *See Millington v. Temple Univ. Sch. Of Dentistry*, 261 Fed. App. 363, 365 (3rd Cir. 2008). A physical condition may qualify as a "disability" within the meaning of the ADA because it "substantially limits one or more ... major life activities." 42 U.S.C. § 12102. The Fourth Circuit has held that to establish that one is disabled under the ADA, the plaintiff must prove he has a physical or mental impairment; that this impairment implicates at least one major life activity; and the limitation is substantial. *See Heiko v. Columbo Savings Bank, F.S.B.*, 434 F.3d 249, 254 (4th Cir. 2006).

With regard to Kelly's claims against Baker and Thomas, the Court finds that Kelly has failed to demonstrate constitutional injury. Both Defendants deny Kelly's claims that there was a link between his refusal to accept general population assignment and his ability to get a haircut, nor was there a link between Kelly's pursuit of his litigation and his ability to have his hair cut. There is no dispute that Kelly received a haircut within one month of the incident and was able to proceed with his lawsuits in the time following the May 13, 2017 incident. Even assuming the denial of an opportunity to receive a haircut might, under circumstances not described in Kelly's

complaint, implicate a constitutional right, that denial did not take place here. At most, Kelly's claim describes a mere inconvenience arising from his inability to receive a haircut on the day he wanted one. Such inconvenience is not the sort of deprivation remotely contemplated by the Eighth Amendment's prohibition against cruel and unusual punishment.

## Conclusion

Kelly has failed to allege facts from which liability on the part of Defendants might arise or a colorable claim of a violation of his constitutional rights. Summary judgment will be entered in favor of Defendants in a separate Order to follow.[6]

Date: May 15, 2018

_____
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

---

[6] In light of this decision, Kelly's Motion for Appointment of Counsel shall be denied. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984).

14